# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

LASHORN SPARROW,

                    Petitioner,

    v.                                9:16-CV-204
                                            (TJM/ATB)

THOMAS R. GRIFFIN, Superintendent

                    Respondent.

LASHORN SPARROW, Petitioner, pro se
LISA FLEISCHMAN, PAUL LYONS, AAGs, for Respondent

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).

Petitioner, incarcerated at Green Haven Correctional Facility, filed this petition, pursuant to 28 U.S.C. § 2254, challenging a judgment of conviction, dated June 15, 2011. (Amended Petition ("Am. Pet.") ¶ 2). Petitioner was convicted of Assault, Second Degree pursuant to N.Y. Penal Law § 120.05(3), after a jury trial in the Oneida County Court. Petitioner was sentenced as a second felony offender on August 2, 2011 to a determinate term of seven years of incarceration with five years of post-release supervision. (Am. Pet. ¶¶ 2-3). On May 9, 2014, the Appellate Division, Fourth Department affirmed his conviction, and on July 30. 2014, the New York Court of Appeals denied leave to appeal. *People v. Sparrow*, 117 A.D.3d 1563 (4th Dep't), *lv. denied*, 23 N.Y.3d 1043 (2014).

On May 8, 2015, petitioner filed a pro se motion to vacate his conviction pursuant to N.Y. Crim. Proc. Law § 440.10 which was denied by the trial court on June 9, 2015. (State Court Record ("SR") 1211-14, 1219-23) (Dkt. No. 17-5).[1]  Petitioner's motion for "Clarification or Reconsideration" of the section 440.10 motion was denied on August 11, 2015. (SR 1228-31).  The Appellate Division, Fourth Department denied petitioner leave to appeal the denial of his section 440.10 on November 5, 2015. (SR 1287-88).

Petitioner also attempted to file a petition for a writ of error coram nobis in the Appellate Division, Fourth Department, alleging ineffective assistance of appellate counsel. (SR 1289-1303).  However, on January 4, 2016, the Appellate Division, Fourth Department returned petitioner's papers to him "without consideration because [the petition] fail[ed] to comply with this Court's rules." (SR 1304).  The letter was accompanied by a copy of the court's rules, and stated that "if you choose to resubmit your motion, you must provide proof of reservice of the motion on all necessary parties, and you may require a new return date." (SR 1304).  On March 16, 2016, petitioner wrote a letter to the Appellate Division, inquiring about the "status" of his case, so that he could "proceed accordingly in the Federal Courts in which I have already filed a

---

[1] Respondent has filed the state court records ("SR") as Dkt. No. 17.  Respondent has numbered the pages of the record consecutively as directed by the Local Rules of the Northern District of New York from (SR.-1 to SR 1306).  However, due to the length of the documents, they are filed in five sections of Dkt. No. 17   Dkt. No. 17-1 to 17-5.  There are a multitude of numbers on the pages of the state court papers.  For ease of reference, the court will cite to the SR page, together with the docket number if necessary for clarity.

petition."[2] (SR 1305).  On March 21, 2016, the Appellate Division, Fourth Department responded by letter, reminding petitioner that his coram nobis papers were returned to him by letter dated January 4, 2016, and that the court had "no record of any coram nobis motion being accepted for filing, and therefore, [petitioner had] no coram nobis motion pending with [the Appellate Division, Fourth Department]." (SR 1306). Petitioner never re-filed his coram nobis petition in state court.

In this application, petitioner raises the following grounds for relief: the evidence was insufficient to support a guilty verdict (Ground One); trial counsel was ineffective for failing to make routine objections, request certain jury instructions, and challenge the trial court's subject matter jurisdiction (Grounds Two and Six); the prosecutor improperly vouched for the credibility of witnesses and "injected his own opinion and testimony" (Ground Three); the trial court improperly admitted into evidence "an irrelevant and prejudicial video tape made at the direction of the prosecution to support" petitioner's guilt (Ground Four); and statements that petitioner made to the police should have been suppressed (Ground Five); and petitioner's appellate counsel was ineffective because he failed to raise ineffective assistance of trial counsel because trial counsel failed to raise and entrapment defense "and/or arguing contributory negligence which led to the [officer's injury]" (Ground Seven). (Am. Pet. at ¶ 12,

---

[2] Petitioner filed his original petition on February 22, 2016. (Dkt. No. 1).  On February 23, 2016, the case was administratively closed because petitioner did not pay the filing fee, nor did he apply to proceed without payment of fees. (Dkt. No. 2).  Petitioner paid the five dollar filing fee, and the case was reopened on March 23, 2016. (Dkt. No. 3).  After initial review of the petition, Judge McAvoy ordered petitioner to file an amended petition, specifying all the grounds upon which the petition was based and clarifying whether and when he filed state court proceedings relative to his criminal conviction. (Dkt. No. 4).  Petitioner filed his amended petition on April 29, 2016, and I ordered the respondent to file an answer and supporting documents on May 4, 2016. (Dkt. Nos. 5, 6).

CM/ECF pp.5-11).

Respondent has filed an answer to the petition, together with the pertinent

state court records and a memorandum of law. (Dkt. Nos. 16, 17).  For the following

reasons, this court agrees with respondent and will recommend denial of the petition.

## DISCUSSION

## I.    <u>Relevant Facts</u>

Respondent has included a detailed description of the facts and procedural

history of this case. (Dkt. No. 15 at 2-13).  The court will summarize the relevant facts

for clarity, and will discuss specific facts as necessary in the analysis of petitioner's

claims.

In November of 2010, the Utica Police were investigating Tremayne Sanders, a

known cocaine dealer.  On November 1, 2010, Investigator Mark Fields of the Utica

Police "Metro Narcotic Unit ("Metro Unit")"[3] obtained a search warrant from a Utica

City Court Judge to search Mr. Sanders. (Fields: Trial Transcript ("T")[4] 183, 187-88,

198-201; SR 361, 365-66, 376-79).  The search warrant stated that Mr. Sanders could

be searched "wherever he may be found." (Fields: T. 199-200, SR 377-78).  The search

warrant also provided that Mr. Sanders could be searched for "any type of cocaine, U.S.

currency, any type of records, photographs, keys, bank books, [or] anything that would

---

[3] Investigator Fields testified that the Metro Narcotic Unit "investigate[s] street-level to mid-level narcotic interdiction throughout the City of Utica." (T. 183, SR 323). The officers in the Metro Unit work in plain clothes. (T. 184, SR 362).

[4] As noted by respondent, the Trial Transcript is contained in SR 127-811. (Dkt. No. 15 at 2 n.1).  However, the trial transcript is separately paginated. (Dkt. No. 17-1-17-3).  For ease of reference, the court will cite to the transcript as it is cited in respondent's papers, with the actual transcript page, but will add the SR pagination also.

indicate there was some type of interdiction [sic] of cocaine." (Fields: T. 200, SR 378). A copy of the search warrant, signed by a Utica City Court Judge was admitted, without objection, as evidence at the trial. (*Id.*) Investigator Fields testified that it was the third time in six months that he was executing a search warrant for Mr. Sanders or his residence. (Fields: T. 187-88, SR 365-66).

Investigator Fields met with Investigator Peter Paladino, Officer James Holt, and Deputy United States Marshal ("Deputy") Gregory Morawiec, and they developed a plan to execute the search warrant under the guise of a routine traffic stop. (Fields: T. 188-89, 207, SR 366-67, 385; Paladino: T. 254, SR 436). The plan was to conduct surveillance on Mr. Sanders's residence with the assistance of Investigator Paladino, Deputy Morawiec, and Officer Holt. (T. 189, 207, SR 367, 385). They began watching Mr. Sanders's address at 10:45 a.m. on November 5, 2010. (T. 189, SR 367). The members of the team were in three separate cars. Investigator Fields was in plain clothes, in an unmarked grey Acura, parked in a parking lot, six to seven houses from Mr. Sanders's residence, and Investigator Fields testified that he was able to view the residence with binoculars. (Fields: T. 190-91, 204, 206, SR 368-69, 382). Officer Paladino, also in plain clothes, was in an unmarked car which was parked a few houses west of Mr. Sanders's residence. (Paladino: T. 253-55, SR 437-39).

Finally, Deputy Morawiec and Officer Holt were in "full" uniform, in a marked Utica Police patrol car, parked on a side street around the corner from Mr. Sanders's residence. (Paladino: T. 262, SR 444; Morawiec: 317-18, 331-32, SR 499-500; Holt: T. 366-70, SR ). Deputy Morawiec testified that although he was a sworn, federal police

officer, he was "assigned to the Utica Police Department, Metro Narcotics Unit, and had been so assigned for the past year. (Morawiec: T. 316, SR 498). When Deputy Morawiec arrived for work on November 5, 2010, Investigator Fields asked Deputy Morawiec to assist the team in executing the warrant. (Morawiec: T. 317, SR 499). Investigator Fields specifically asked Deputy Morawiec to "put on [his] uniform because [he] would be in the marked police vehicle. . . ." (*Id.*) The marked police car was parked in an area that was out of sight of the Sanders's residence. (Morawiec: T. 318, SR 500). Deputy Morawiec testified that the team was not sure how "[the execution of the warrant] was going to take place," and the marked police vehicle, with two uniformed officers, was being used so that there would be no confusion during the traffic stop. (*Id.*)

The officers were familiar with both Mr. Sanders and petitioner. (Morawiec: T. 318-19, SR 500-501). Deputy Morawiec testified that he was familiar with Mr. Sanders selling narcotics and "running from police." (Morawiec: T. 319, SR 501). At approximately 1:45 or 2:00 p.m., Investigator Fields radioed the team to let everyone know that he saw a green SUV Infiniti pull into Mr. Sanders's driveway. (Fields: T. 191, 203, SR 369, 381; Morawiec: T. 319, SR 501). Investigator Fields testified that a person, who he recognized as petitioner, got out of the SUV. (Fields: T. 203, SR 369). Petitioner entered through the front door of Mr. Sanders's residence. (*Id.*) Investigator Fields identified petitioner in the courtroom. (Fields: T. 192, 369). Petitioner and Mr. Sanders exited the building approximately one hour later. (*Id.*) Petitioner got back into the SUV and began backing up. He stopped, and Mr. Sanders got into the passenger

side of the vehicle. (*Id.*)  Inspector Fields and Inspector Paladino both testified that they were sure that Mr. Sanders was the passenger in petitioner's SUV. (Fields: T. 203, SR 369; Paladino: T. 256, SR 438).  The petitioner and Mr. Sanders then exited the driveway and proceeded to drive East on Richardson Avenue toward Genesee Street in Utica. (Fields: T. 193, SR 371; Paladino: T. 256, SR 438).

At that point, Inspector Fields radioed Officer Holt and Deputy Morawiec, who were in the marked police vehicle and directed them to conduct a stop of the SUV, letting them know that Mr. Sanders was inside the SUV. (Fields: T. 192-933, SR 370-71; Morawiec: T. 319-20; SR 501-502; Holt: T. 370-71, SR 552-53).  The patrol car activated its "emergency lights" and pulled in behind the SUV.  When the SUV came to a stop, Fields positioned his vehicle "right in front of the SUV to basically cut it off, [and] not allow it to go further if he decided to take off." (Fields: 193-94, 228-30, SR 371-72; 407-408).  The marked patrol car and Inspector Paladino's unmarked car then parked behind the SUV. (Paladino: 256-57, 263, 269-71, SR 438-39, 445, 451-53; Holt: T. 371-72, 389-92, 414-15, SR 553-54, 571-73, 625-26).

Officer Holt and Deputy Morawiec, both in uniform, got out of the patrol car and ran to the passenger's side of the SUV. (Fields: T. 194, SR 372; Paladino: T. 257, SR 439; Morawiec: T. 321, 354, SR 503, 536; Holt: T. 372, SR 554).  They both testified that they yelled numerous times loudly: "police, search warrant, get out of the car." (Morawiec: T. 321-23, 335, 355, SR 503-505, 517, 537; Holt: T. 372, 376-77, 396-97, 415, SR 554, 558-59, 578-79, 626).  Both Inspector Fields and Inspector Paladino testified that they heard Officer Holt and Deputy Morawiec yelling these commands at

7

petitioner and Mr. Sanders. (Fields: T. 194-95, SR 372-73; Paladino: T. 263, SR 445).

Inspector Fields heard Holt and Morawiec yelling "Police, Search Warrant. Open the

door," and Paladino heard them yell several times: "Police, let me see your hands," but

did not recall them mentioning the search warrant. (*Id.*) Inspector Fields clearly

identified the petitioner as the driver of the SUV. (Fields: T. 194-95, SR 372-73). They

tried to enter the SUV, but the doors were locked. (Morawiec: T. 323, 336, 354-55, SR

505, 518, 536-37). On cross-examination, Deputy Morawiec testified that, at one point,

he attempted to open the passenger side door by lifting up the handle, but the door was

locked. (Morawiec: T. 354-55, SR 536-37). The patrol car lights were on throughout

the incident, and according to Officer Holt, "[i]t was obvious they saw who we were."

(Holt: T. 372, 419, SR 554, 630).

    At the same time, Inspector Fields approached the driver's side of the SUV and

yelled five to seven times: "Police, Search Warrant. Open the door." (Fields: T. 194,

234-35, 237; SR 372, 412-13, 415). He testified that he was in plain clothes, but he had

a badge around his neck and was holding a radio. (Fields: 209-10, 231-32; SR 387,

409-410). Fields testified that he could see the petitioner through the window in the

driver's seat of the car. (Fields: T. 209-210, 237-38, SR 387-88, 415-16). None of the

officers had their guns drawn, and both Morawiec and Holt testified that they made eye-

contact with petitioner and Mr. Sanders.[5] (Morawiec: T. 323-24, 336, 356, SR 505-506,

518, 538; Holt: T. 372, 377-78, SR 554, 559-60).

    As the officers were ordering Mr. Sanders and petitioner to get out of the car so

---

[5] Deputy Morawiec testified that he also saw Mr. Sanders pull something from his left pocket
and "seclude it" in his rectum. (Morawiec: T. 323, 357-58, SR 505, 539-40).

that the officers could search Mr. Sanders, the SUV abruptly backed up and then drove forward around the Acura in order to escape. (Fields: T. 195, SR 373; Paladino: T. 257-58, SR 439-40; Holt: T. 372-73, 386, SR 554-55, 568).  As the SUV accelerated backward, the passenger-side mirror hit Deputy Morawiec in the chest and snapped off the SUV. (Fields: T. 209, SR 209; Morawiec: T. 324-36, 339-40, SR 506-508, 521-22; Holt: T. 373, 385-86, 397-98, SR 555, 566-67, 579-80).  When the mirror hit Deputy Morawiec, it knocked him into Officer Holt, and both officers fell to the ground. (Paladino: T. 258, SR 440; Morawiec: T. 324-26, 357, SR 506-508; Holt: T. 373, SR 555).  Deputy Morawiec was ultimately taken to the hospital, where it was determined that he had a torn ligament in his hand and suffered severe bruising and swelling to his chest.[6] (Morawiec: 328-30, 340-41, SR 510-12, 522-23).  He was given pain killers and was told to stay home from work for one week. (Morawiec: T. 329-30, SR 511-12).

Officer Holt followed petitioner's SUV in the patrol car, followed by Investigator Paladino in the unmarked car. (Fields: T. 197, SR 375; Paladino: T. 258-59, SR 440-41; Holt: T. 373-75, SR 555-56).  Petitioner ultimately turned onto a road in which the traffic was so heavy that he had no hope of escaping. (Paladino: T. 260, 265, SR 442, 447).  Petitioner was forced to pull into a parking lot, where he and Mr. Sanders were taken into custody. (Paladino: T. 260-61, SR 442-43; Achen: T. 311-13, SR 493-95; Holt: T. 375-76, SR 557-58).

Katherine Achen - a bystander/witness - testified that she saw the entire incident.

---

[6] Deputy Morawiec testified that, after he was knocked to the ground, he was in substantial pain, he could not breathe, and he could not move. (Morawiec: T. 326, SR 508).  Inspector Fields came to his assistance and stayed with him until a police vehicle came to take him away. (*Id.* T. 326-27, SR 508-509).

She testified that she saw the initial stop when she was parked in the "drive-through" lane of a bank across the street, and then followed the officers who were chasing petitioner and Mr. Sanders. (Achen: T. 283-84, SR 465-66). She followed them until petitioner turned into the parking lot, and she observed the two men being taken into custody. (Achen: T. 284, SR 466). Ms. Achen testified that she followed the SUV because she knew a policeman had been hit or "run over" by the fleeing vehicle, and she wanted to get the license plate number of the car, "thinking that I was a witness . . . ." (Achen: T. 285-86, SR 467-68). Ms. Achen also testified that she did not have any trouble identifying the "police officers" because of their black uniforms, the white police car, with the Utica "logo" on the side, and the flashing lights. (Achen: T. 287-88, SR 469-70). She did not see any the officers wearing masks, she did not see "clubs" in their hands, she did not see the officers hit the SUV or the suspects, and she did not see any of the officers draw their guns. (Achen: T. 288-89, SR 470-71).

Inspector Fields testified that, immediately after the arrest, the police obtained a search warrant for Mr. Sanders's home, where they found crack cocaine. (Fields: T. 214-15, SR 392-93). Mr. Sanders was subsequently charged with Criminal Possession of a Controlled Substance, Third Degree in addition to other crimes. (*Id.*) Petitioner and Mr. Sanders were both at the police station later that evening. Inspector Fields testified that at approximately 7:00 p.m., he was speaking with Mr. Sanders about his charges, when petitioner, who was seated nearby, stated that, he "wanted to apologize for what happened," and that he "did not mean to hurt anybody." (Fields: T. 215-18, SR 293-96). Petitioner also told Inspector Fields that he knew that they were "police"

10

because "the [unmarked] car that [they] had at one time used to be his."[7] (Fields: T. 216, 239-42, SR 394, 417-20). Inspector Fields acknowledged on cross-examination at trial, that during his grand jury testimony, he mentioned that petitioner recognized the Acura as being "his," but Fields never mentioned that petitioner "knew" that the officers were the "police." (Fields: T. 238-42, SR 416-20).

Inspector Fields testified that the patrol car's video camera was not operational, so no surveillance video was recovered from the incident, even though the camera had been "activated" at the time of the stop. (Fields: T. 244-45, 250-51, SR 422-23, 428-29). The officers discovered the problem when they went to retrieve the videotape after the incident, determined that there was a computer problem, and that the incident had not been not "taped." (Fields: T. 251, SR 429; Holt: T. 398-99, SR 398-99). However, District Attorney Investigator, David Cady later staged and videotaped a re-enactment of the incident that was admitted as evidence at petitioner's trial. (Fields: T. 222, SR 400, Holt: 388-89, SR 570-71; Cady: T. 423-51, SR 634-62). Investigator Cady described the entire videotaping procedure at trial. (Cady: T. 423-51, SR 634-62).

Petitioner testified at trial and admitted many of the facts to which the officers and Ms. Achen testified. However, Petitioner maintained that he was unaware that police officers were involved in the incident. Petitioner testified that he was driving on Richardson Avenue, when a grey Acura pulled out in front of him, causing him to stop. (Sparrow: T. 459-60, SR 670-71). At trial, petitioner stated that he could not see out of

---

[7] Inspector Fields testified that the Acura that he was driving on November 5th was seized as part of a narcotics investigation, and that Fields found a "Pep Boys Automotive" receipt in the glove compartment with petitioner's name on it. (Fields: T. 211-13, SR 389-91).

the passenger's side window because Mr. Sanders was blocking his view. (Sparrow: T. 466-67, 480). Petitioner testified that Mr. Sanders told petitioner that someone was banging on the passenger's side with "objects, he said like guns, . . . so I got scared. I backed up a little bit, and I went around." (Sparrow: T. 460-61, SR 470-72).

However, on cross-examination, petitioner admitted that he testified before the Grand Jury that the people who initially approached his SUV were wearing black masks and hitting his SUV with "guns." (Sparrow: T. 469-73, 477-80, SR 680-84, 688-91). Petitioner testified that he finally saw the police car when he turned onto Campion. He stated that he pulled into the parking lot because he saw "the regular police car flag." (Sparrow: T. 461, SR 672).

At the close of the prosecution's case, the People withdrew the charge of obstructing governmental administration, and petitioner was convicted on the remaining charge of Assault, Second Degree.

## II.    **Exhaustion/Procedural Default**

### A.    **Legal Standards**

#### 1.    **Exhaustion**

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with

powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.*; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

"A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.'" *Hernandez v. Conway*, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir.1982)).

## 2.    Procedural Default

A federal judge may not issue a writ of habeas corpus if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim. *See Wainwright v. Sykes*, 433 U.S. 72, 81-85 (1977).  A federal habeas court generally will not consider a federal issue if the last state court decision to address the issue "'rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)) (emphasis added). This rule applies whether the independent state law ground is substantive or procedural.  *Id*.  If the state court rejects a specific claim based on an independent and adequate state law procedural ground, then the federal court should not review the merits even if the state court addressed the merits "in the alternative." *Harris v. Reed*, 489 U.S. 255, 264 n.10

13

(1989). "By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Id.*

State procedural grounds are only "adequate to support the judgment" if they are "firmly established and regularly followed" in the state. *Pitre v. Griffin*, No. 16 Civ. 6258, 2016 WL 7442653, at *10 (E.D.N.Y. Dec. 26, 2016) (citing *Lee v. Kemna*, 534 U.S. at 376 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). In certain limited circumstances, even firmly established and regularly followed rules will not prevent federal habeas review if the application of that rule in a particular case would be considered "exorbitant." *Pierotti v. Walsh*, 834 F.3d 171, 177 (2d Cir. 2016) (citation omitted); *Garvey v. Duncan*, 485 F.3d at 713-14 (quoting *Lee v. Kemna*, 534 U.S. at 376).

In order to find that the application of a generally sound rule is exorbitant, the court considers (1) whether the alleged procedural violation was actually relied upon by the state court and whether perfect compliance with the state rule would have changed the court's decision; (2) whether state case law indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner "substantially complied" with the rule, given the realities of trial and whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003).

Once the court determines that procedural default properly applies, the petitioner may only obtain federal habeas review of the defaulted claim if he can show both cause

for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that the constitutional violation has resulted in the conviction of one who is "actually innocent." *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012); *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted). The actual innocence prong is referred to as the fundamental miscarriage of justice exception. *Rivas, supra.* "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule."[8] *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation. *Stickler v. Greene*, 527 U.S. 263, 289 (1999).

In addition, if the court finds that petitioner has failed to exhaust his claims, but he cannot return to state court, petitioner's claims are then "deemed" exhausted, but would be barred by procedural default. *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994). The court then conducts the procedural default analysis. *Id.*

**B.    Application**

**1.    Sufficiency of Evidence (Ground One)**

Petitioner claims that the evidence was insufficient to prove that he committed the crime of Assault, Second Degree. At the end of the prosecution's case, petitioner moved for a trial order of dismissal. (T. 452-53, SR 663-64). His bases for asserting

---

[8] A finding of ineffective assistance of counsel may constitute "cause" excusing procedural default. *Tavarez v. Larkin*, 814 F.3d 644, 650 (2d Cir. 2016). However, in order to assert ineffective assistance of counsel as "cause" for a procedural default, the claim must be separately and specifically exhausted in state court. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).

insufficiency of evidence were that (1) the prosecutor failed to prove injury, and (2) that the prosecutor had failed to prove that petitioner knew that the individuals were police officers.[9] (*Id.*)  However, petitioner failed to renew his motion after presenting his evidence, which included his own testimony, asserting his defense that he did not know that the individuals who were approaching his car were police officers. (T. 494, SR 705).

Petitioner raised this "legal" sufficiency of evidence claim in his direct appeal, and the court held that "[b]y failing to renew his motion for a trial order of dismissal after presenting evidence, defendant failed to preserve for our review his contention that the conviction is not supported by legally sufficient evidence . . . ." *Sparrow*, 117 A.D.3d at 1563 (citing *People v. Hines*, 97 N.Y.2d 56, 61 (2001), *rearg. denied*, 97 N.Y.2d 678 (2001)).  The court also held that, "[i]n any event, that contention is without merit." *Id.*  Thus, the last court to consider petitioner's claim relied on a procedural default in dismissing the claim.  This court must now determine whether the procedural rule is "adequate to support the judgment" and if it is "firmly established and regularly followed" in the state.

In *People v. Hines*, at the end of the prosecution's case in chief, Hines's counsel moved for a trial order of dismissal based on specific insufficiency claims.[10] 97 N.Y.2d

---

[9] Petitioner was charged with Assault, Second Degree, N.Y. Penal Law § 120.05(3).  The relevant elements of this crime are that, with the intent to prevent a peace officer or a police officer from performing a lawful duty, he or she causes physical injury to such peace officer or police officer. The section is very lengthy and includes a variety of other individuals who perform "lawful duties." However, the relevant individuals in petitioner's case were peace officers or police officers.

[10] One of the issues was whether Hines exercised dominion and control over an apartment in which drugs were found. 97 N.Y.2d at 59.

at 59.  However, after the motion was denied, both defendants put on a defense by testifying and calling witnesses. *Id.*  At the conclusion of the proof, Hines's counsel requested a lesser included offense charge, but did not renew his motion for a trial dismissal based on insufficient evidence. *Id.*  The New York Court of Appeals held, over a strong dissent,[11] that a defendant who presents evidence after the trial court has denied motion to dismiss made at the close of the People's case, "waives subsequent review of that determination." *Id.* at 61 (citations omitted).  In *People v. Finch*, the New York Court of Appeals held that *Hines* did not establish a "general rule" that every argument, once made and rejected, needed to be repeated "at every opportunity." *People v. Finch*, 23 N.Y.3d 408, 416 (2014).  The court held that Finch's argument, made at his arraignment, did not need to be repeated in his trial motion to dismiss. *Id.* However, the court in *Finch* declined to consider the "criticisms" of the *Hines* result and was not overruling it. *Id.*

In *Diaz v. Artus*, the court specifically held that the *Hines* rule was a firmly established and regularly followed state practice sufficient to satisfy the "adequate" prong of the "adequate and independent" test. *Diaz v. Artus*, No. 1:12-CV-75, 2015 WL 277410 at *11 (W.D.N.Y. Jan. 22, 2015) (citing *Montgomery v. Wood*, 727 F. Supp. 2d 171, 181 (W.D.N.Y. 2010) (analyzing the "adequacy" of the *Hines* preservation rule for legal insufficiency claims in habeas petition where petitioner testified at trial and

---

[11] The dissenting judge (Smith, J) believed that the court should overlook the default because, in the judge's opinion, the evidence was insufficient, and the court should consider the argument.  In addition the dissenting judge also believed that once the defendant presented his specific motion to dismiss at the end of the People's case, he need not make the motion again at the end of his case to preserve it for appellate review. 97 N.Y.2d at 66.

presented multiple defense witnesses but did not make a motion for a trial order of dismissal after resting) (citations omitted)).  One of the bases for the *Hines* rule is that a defendant who presents evidence after the close of the prosecution's case runs the risk of "inadvertently supplying a deficiency in the People's case[.]" *Id.* (quoting *Hines*, 97 N.Y.2d at 61).

Petitioner's case is almost identical to *Hines*.  Petitioner in this case made a motion for a trial order of dismissal at the end of the prosecution's case, then testified on his own behalf,[12] and failed to renew his motion after the close of all the proof. Thus, the court's application of *Hines* to petitioner's case was proper because *Hines* is well established and regularly followed.  In addition, the application was not "exorbitant" because this is exactly the case to which *Hines* is applied, for the reasons that *Hines* is applicable.  This is true, notwithstanding the fact that the court has failed to extend *Hines* to other circumstances.  Thus, this court may not revisit petitioner's sufficiency claim unless petitioner can show cause and prejudice.

Petitioner has shown neither cause for the default, nor prejudice resulting from any alleged violation, nor can petitioner show that the failure to consider the federal claim will lead to a "miscarriage of justice."  Petitioner raised his attorney's failure to renew his motion for a trial order of dismissal as part of his ineffective counsel claim on direct appeal. (SR 891).  He cited *Hines* and argued that his attorney was ineffective

---

[12] The court would point out that petitioner did the only thing that he could in this situation. The prosecution's case was very strong.  They had several police witnesses and one bystander witness who saw the entire incident.  Petitioner's only hope was that the jury might believe his testimony that he could not see the officers and did not know that the car behind him was a police car because the Acura in front of him was unmarked.  Unfortunately for petitioner, the jury did not believe him, and his testimony may have even reinforced their determination as the *Hines* court analysis suggested.

because in failing to renew his motion, he waived the Appellate Court's consideration of the issue. (*Id.*)  However, he has omitted the argument entirely from his habeas petition.  Although he still raises ineffective assistance of counsel as Ground Two of his petition and has included many of counsel's alleged failings that petitioner raised on appeal, his failure to renew the motion to dismiss is not one of those alleged failings. (Am. Pet. at 8).

However, because petitioner has raised an ineffective assistance of counsel claim in the amended petition, and because he asserted on direct appeal, that his attorney was ineffective when he failed to renew his motion to dismiss at the close of all the evidence, this court will address petitioner's second ground as if is raising the same argument that he raised on appeal.  Thus, the court will address ineffective assistance of counsel on the merits below as part of petitioner's stand-alone claim of ineffective assistance of counsel.  Because the court finds that petitioner's counsel was not constitutionally ineffective, petitioner cannot assert either ineffectiveness as a stand-alone claim, nor can he assert that counsel's failure to renew the motion to dismiss constituted "cause" for purposes of the procedural default analysis.  Thus, Ground One of the amended petition may be dismissed.

### 2.    Prosecutorial Misconduct (Ground Three)

Petitioner claims that the prosecutor committed various acts of misconduct, including vouching for the credibility of his own witnesses and interjecting his own opinion and "testimony" into the trial.  The Appellate Division found that petitioner "failed to preserve for our review his contention that he was deprived of a fair trial by

19

prosecutorial misconduct."[13] 117 A.D.3d at 1564.  The court then declined to review the merits of petitioner's claim in the alternative as they did with petitioner's sufficiency of evidence claim.  Thus, the Appellate Division clearly relied upon a procedural default in denying petitioner's prosecutorial misconduct claim, and this court must determine whether cause and prejudice exists.

As stated above, petitioner has not alleged in his amended petition that his counsel's conduct constituted "cause," although petitioner did raise the claim as a stand-alone ineffective assistance of counsel claim.  The court will therefore address petitioner's ineffective assistance of counsel claim below.  Based on the determination that counsel was not ineffective, and therefore there was no "cause" for petitioner's procedural default, the court need not consider whether petitioner suffered prejudice.  In addition, failure to consider petitioner's claims on the merits will not result in a fundamental miscarriage of justice or any danger that petitioner is actually innocent of the crime.  Thus, Ground Three may be dismissed.

### 3.    Admission of Re-Enactment Video (Ground Four)

Petitioner argues that the admission into evidence of a video, made by the prosecutor's investigator, who re-enacted the crime, was error and denied him a "fair

---

[13] Although the Appellate Division did not specifically state in its narrative the basis for the procedural default, the court cited, inter alia, N.Y. Crim. Proc. Law § 470.05(2) at the end of the sentence. 117 A.D. at 1654. This section of the Criminal Procedure Law provides that a party claiming error must have objected at a time when the court had an opportunity to correct it.  In addition, the prosecutor argued in his appellate brief that "[n]one of the objectionable remarks by the prosecutor were preserved for review by objection." (SR 1170).  The rule requiring a contemporaneous objection is "firmly established and regularly followed," and thus, sufficient for finding a procedural default. *Golson v. Griffin*, No. 1:13-CV-92, 2017 WL 1176049, at *5 (W.D.N.Y. Mar. 30, 2017) (citing inter alia *Cotto v. Herbert*, 331 F.3d at 244).

trial." (Am. Pet at 11).  Respondent argues that this claim is both unexhausted and subject to procedural default.

Petitioner raised this evidentiary claim in his direct appeal. (SR 898-900). Petitioner argued that the officers' testimony was inconsistent regarding the description of their locations during the incident and exactly where they were at the time the SUV hit Deputy Morawiec.  In addition, petitioner states that the video re-enactment was inaccurate because there was no passenger in the car during the re-enactment. (SR 899). Petitioner argued that these testimonial inconsistencies and differences in the re-enactment prevented the video from being an accurate depiction of what petitioner would or would not have been able to see at the time he backed his car up and hit Deputy Morawiec. (*Id.*)  Petitioner argued that the admission of the video was more prejudicial than probative, a common state law evidentiary argument.  Petitioner ended his argument by stating that he was denied his "constitutional right to a fair trial." (*Id.*)

Petitioner cited no Supreme Court or other federal case law in support of this evidentiary argument in his state court appellate brief.  The cases cited by petitioner only discussed state law evidentiary issues. *See People v. Acevedo*, 40 N.Y.2d 701, 705 (1976); *People v. Cabellero*, 34 A.D.3d 690 (2d Dep't 2006).  In *People v. Cabellero*, the Appellate Division found that it was in the trial court's discretion to determine whether demonstration evidence was more prejudicial than probative, "based on the nature of the proffered proof and the context in which it is offered . . . ." 34 A.D.3d at 692 (quoting *People v. Acevedo*, 40 N.Y.2d at 704).

Evidentiary rulings do not automatically rise to the level of federal constitutional

claims unless specifically identified as "federal" constitutional claims. *See Duncan v. Henry*, 513 U.S. 564 (1995) (petitioner asserted evidentiary error under the California Constitution, but court held no exhaustion).  The general reference to "due process" and/or a "fair trial" is insufficient for exhaustion purposes. *Smith v. Duncan*, 411 F.3d 340, 349-50 (2d Cir. 2005).  *See Rhodes v. Artus*, No. 09 Civ. 4251, 2016 WL 7176645, at *6 (S.D.N.Y. Dec. 8, 2016) (citing inter alia *Petrucelli v. Coombe*, 735 F.2d 684, 688–89 (2nd Cir. 1984)) (general allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated); *Tyrell v. Lee*, No. 11 Civ. 3348, 2015 WL 9666334, at *7 (S.D.N.Y. Dec. 14, 2015) (same).  The last sentence of petitioner's Appellate Division brief reads: "Mr. Sparrow was denied his constitutional right to a fair trial through prosecutorial misconduct, ineffective assistance of counsel, and the improper admission of allegedly prejudicial evidence. (SR 903).  This vague assertion at the end of his brief does not change this court's finding.

The court has also reviewed the People's brief to the Appellate Division, and the prosecutor cited only the New York State case law analyzing the admissibility of evidence. (SR 1171-73).  Petitioner raised the identical claims in his application for leave to appeal to the New York Court of Appeals. (SR 1181-82).  Thus, petitioner in this case has failed to exhaust his state court remedies with respect to his claim that the re-enactment video was improperly admitted.

Although petitioner has failed to exhaust his state court remedies with respect to the admission of the re-enactment video, he may not return to state court to attempt to

raise the claim as a federal constitutional claim.  A claim that evidence was improperly admitted is generally "record-based," and therefore, properly raised on direct appeal. He has already filed a direct appeal in the Appellate Division.  He cannot return to the Court of Appeals because New York permits only one application for direct review. *Oquendo v. Senkowski*, 452 F. Supp. 2d 359, 368 (S.D.N.Y. 2006) (citing *Spence v. Superintendent*, 219 F.3d 162, 169-70 (2d Cir. 2000); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)); N.Y. Rules of Court, Court of Appeals § 500.20.  Petitioner would also be unsuccessful in moving to vacate his conviction pursuant to N.Y. Crim. Proc. Law § 440.10 because the claim would be dismissed due to petitioner's unjustifiable failure to raise the record-based federal claim on direct appeal. *Jackson v. Conway*, 763 F.3d 115, 143-44 (2d Cir. 2014) (citing inter alia § 440.10(2)(c)).  The petitioner's claim is, therefore, "deemed exhausted," but is subject to a procedural bar. This procedural bar is independent and adequate, and is consistently applied. *See Clark v. Perez*, 510 F.3d at 393 (discussing § 440.10(2)(c)).

Petitioner has demonstrated neither cause nor prejudice resulting from an alleged federal law violation.  Petitioner cannot claim ineffective assistance of counsel with respect to this claim.  Petitioner's trial attorney objected to the admission of the video tape, arguing that there was no "consensus" regarding where the vehicles were located, and that showing the video to the jury would "unduly emphasize[] the versions that the prosecutor wants the jury to accept." (T. 404-405, SR 619-20).  The trial court judge ruled that counsel's argument "goes to the weight of the evidence rather than the admissibility." (T. 406, SR 621).  The judge also told counsel that he would "give a

limiting instruction . . . as to how [the jury] can consider it," including an instruction that the jury could "completely disregard" it if the jury did not feel that the video had evidentiary value, or consider it for "whatever purpose" the jury felt was "relevant" after they saw it. (T. 406-407, SR 621-22).

Counsel also brought out the deficiencies in the video during voir dire examination of Investigator Cady. (T. 430-35, SR 641-46). The judge gave his limiting instruction immediately after admitting the DVD and prior to showing the video to the jury. (T. 435-36, SR 646-47). Counsel engaged in lengthy cross examination of the Inspector. (T. 444-51, SR 655-62). Because petitioner cannot show cause for his default, the court need not address prejudice. The court also finds that the failure to consider petitioner's claim will not result in a miscarriage of justice, and petitioner is not actually innocent of this crime. Petitioner's evidentiary claim may be dismissed based upon procedural default.

### 4.    Ineffective Assistance of Appellate Counsel (Ground Seven)

Petitioner states that he raised his ineffective assistance of appellate counsel claim in his application to the Appellate Division for coram nobis relief, which would be the proper way to exhaust a claim of ineffective assistance of appellate counsel. *See People v. Bachert*, 69 N.Y.2d 593, 598, 516 N.Y.S.2d 623, 626 (N.Y. 1987) (In New York, a common law writ of error coram nobis, filed in the appellate court, is the proper vehicle for bringing a claim of ineffective assistance of appellate counsel); *Turner v. Miller*, 124 F. App'x 682, 683-84 (2d Cir. 2005) (same).

Although petitioner attempted to bring a motion for a writ of error coram nobis,

24

he admits that his motion "appears to have been rejected" by the appellate court. (Am. Pet. at CM/ECF p.11). As stated above, it is clear that petitioner did not file his application properly, and that the Appellate Division did reject his papers. (SR 1304, 1306). Although the court's letter informed petitioner that he could re-file, he has not done so, and thus, his ineffective assistance of appellate counsel claims are unexhausted.

Petitioner could conceivably go back to the Appellate Division and file another application for a writ of error coram nobis. Thus, while petitioner's ineffective assistance of appellate counsel claim is unexhausted,[14] he is not barred by procedural default. However, the court has reviewed petitioner's two purported claims of ineffective assistance of appellate counsel and finds that Ground Seven of the petition should be dismissed under 28 U.S.C. § 2254(b)(2) which provides that an application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the petitioner to exhaust his state court remedies.

In *Rhines v. Weber*, 544 U.S. 269, 277 (2005), in conjunction with affirming the denial of a stay to allow petitioner to exhaust his state court remedies, the Supreme Court held that the district court would abuse its discretion if it granted a stay to exhaust "when his unexhausted claims are plainly meritless." *Id.* (citing 28 U.S.C. § 2254(b)(2)). District courts have interpreted this statement as creating the standard for how the district court should dismiss an unexhausted claim on the merits under section

---

[14] *See* 28 U.S.C. § 2254(c) ("[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.")

2254(b)(2). *See Monroe v. Smith*, No. 16 Civ. 2074, 2017 WL 933109, at \*7 (S.D.N.Y. Mar. 8, 2017) (Rep't-Rec.) (citing inter alia *Bravo v. Unger*, No. 10 Civ. 5659, 2014 WL 201472, at \*2 (S.D.N.Y. Jan. 16, 2014); *Williams v. Artus*, 691 F. Supp. 2d 515, 526 (S.D.N.Y. 2010)).  As discussed below, petitioner's claims of ineffective assistance of appellate counsel are completely meritless and border on frivolous.  Thus, petitioner's Ground Seven must also be dismissed.

## III.  <u>Admission of Petitioner's Statements to Police (Ground Five)</u>

### A.  Legal Standards

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a petitioner may not challenge an allegedly unconstitutional search and seizure in an application for federal habeas relief.  *Id.* at 481-82; *see also Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992); *Pina v. Kuhlmann*, 239 F. Supp. 2d 285, 289 (E.D.N.Y. 2003) ("It is well settled that [Fourth Amendment] claims are not cognizable for habeas corpus review where a State has provided a full and fair opportunity to litigate this issue.").

The Second Circuit has determined that review of a Fourth Amendment claim in a habeas corpus application is proper only if: (1) the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (2) the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in that process.  *See Capellan*, 975 F.2d at 70; *Gates v. Henderson*, 568 F.2d 830, 839-40 (2d Cir. 1977).  New York

provides an approved mechanism for litigating Fourth Amendment claims. *See Capellan*, 975 F.2d at 70 (citing N.Y. Crim. Proc. § 710.10 et seq.); *Blake v. Martuscello*, No. 10-CV-2570, 2013 WL 3456958, at *5 (E.D.N.Y. July 8, 2013) (citing N.Y. Crim. Proc. Law § 710.10 and finding that the Second Circuit has explicitly approved New York's procedure for litigating Fourth Amendment claims) (citing *inter alia Capellan*, 975 F.2d at 70 n.1) (other citations omitted)).

The Supreme Court has extended *Stone* to preclude habeas review of a "Fourth Amendment challenge to the introduction of a confession made after an allegedly unlawful arrest." *Glover v. Herbert,* 431 F. Supp. 2d 335, 338 (W.D.N.Y. 2006) (citing *Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983) (per curiam) (reversing grant of habeas corpus where circuit court of appeals found that the issue was whether there was an unattenuated causal link between the custodial statements made by respondent and a violation of the Fourth Amendment)). Thus, *Stone* bars habeas review of claims that statements made during or after an allegedly unlawful arrest should have been suppressed as fruit of that illegal arrest. *Cardwell,* 461 U.S. at 572-73, *Glover,* 431 F. Supp. 2d at 338.

### B.    Application

In this case, petitioner argues, as he did on direct appeal, that his statements to the police following his arrest should have been suppressed because he claims that there was no probable cause to stop his SUV, and because he was prevented from questioning certain witnesses at his state court suppression hearing. (SR 900-03).  The Appellate Division denied petitioner's claim summarily on the merits. 117 A.D.3d at

1564.

 *Stone* prevents the court from considering petitioner's Fourth Amendment claim.
Petitioner moved to suppress his statements to the police and was granted a
*Huntley/Dunaway*[15] hearing by the trial court in order to address the admissibility of
petitioner's statements to the police. (SR 913-21). *See Dunaway v. New York*, 442 U.S.
200 (1979); *People v. Huntley*, 15 N.Y.2d 72 (1965).  Petitioner cannot argue that he
did not have a "full and fair" opportunity to raise his claims.  Clearly, New York State
provides the mechanism to challenge the admissibility of his statements.  Although,
petitioner claims that he was improperly prevented from questioning witnesses, he was
not "prevented from using the mechanism" because of an "unconscionable breakdown"
in the process.

 At the suppression hearing, the prosecutor put Inspector Fields on the stand.  At
the end of Inspector Fields's testimony, the judge asked the prosecutor if he wanted to
put on more witnesses, and the prosecutor declined, but noted that he was stipulating
that no one gave petitioner *Miranda* warnings at any time because the prosecution was
arguing that petitioner's statements were "spontaneous." (SR 919-20, 921).  Petitioner's
attorney objected and stated that he did not "know whether an officer may have said
something to [petitioner] to prompt him to say anything . . . ." (SR 920).  The court
refused to force the prosecutor to call the additional officers or any other officer
involved with petitioner's stop. (SR 921).  This conduct merely involves a decision
regarding whether to call witnesses and cannot be viewed as an "unconscionable

---

[15] A *Dunaway* hearing is the same as a *Huntley* hearing under New York State law.

breakdown in the process." Thus, petitioner's claims challenging the admission of his statements to police are barred by *Stone v. Powell* and may be dismissed.

## IV.  **Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")**

Once the petitioner has surmounted all the procedural requirements attendant to an application for habeas corpus, the court may consider the merits of the petitioner's constitutional claims. The AEDPA provides that, when a state court has adjudicated the **merits** of a petitioner's constitutional claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See also, e.g.*, *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001); *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008). This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted).

To determine whether a state-court decision is contrary to clearly established Supreme Court precedent, the federal court must consider whether the state court decision "'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." *Id*. at 182  (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)) (alterations in original). A state court decision

29

involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle, but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case. *See Williams*, 529 U.S. at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*.  *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

## V.  <u>Ineffective Assistance of Trial Counsel (Grounds Two and Six)</u>

### A.    Legal Standards

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different, and as a result, petitioner suffered prejudice.  *Premo v. Moore*, 562 U.S. 115, 121-22 (2011); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  The standard "must be applied with scrupulous care" in habeas proceedings, because such a claim "can function as a way to escape rules of waiver and forfeiture and raise issued not presented at trial [or in pretrial] proceedings[.]" *Premo*, 562 U.S. at 122. "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Richter*, 562 U.S. at 110 (quoting Strickland, 466 U.S. at 687) (internal quotation marks and further citation omitted).  A petitioner must overcome "a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action "might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Even if a petitioner can establish that counsel was deficient, he still must show that he suffered prejudice. *Id.* at 693-94.

Meeting this burden is "never an easy task . . . [and] establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." *Premo*, 562 U.S. at 122 (citations and internal quotation marks omitted); *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) ("AEDPA erects a formidable barrier" to federal habeas review of an ineffective assistance claim).  When evaluating an ineffective assistance claim under section 2254(d), "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks and citation omitted) (referring to the "doubly deferential judicial review" that applies to *Strickland* claims evaluated under section 2254(d)(1)).  Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" because "[w]hen §2254(d) applies, the question is not whether counsel's actions were reasonable." *Richter*, 562 U.S. at 105.  Instead, "the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.*

### B.    Application

Petitioner's remaining claims all relate to the alleged ineffective assistance of counsel. The Appellate Division in petitioner's direct appeal, and the County Court in petitioner's section 440.10 motion to vacate, decided petitioner's ineffective assistance of counsel claims on the merits.  Thus, the highly deferential AEDPA standard discussed above applies.  In addition, as stated above, petitioner's ineffective assistance of counsel claims include allegations that could, if sustained, rise to the level of "cause" for petitioner's procedural defaults.  The court will thus consider the merits of petitioner's counsel claims as stand alone claims and as potential "cause" for his procedural defaults when appropriate.  For the following reasons, petitioner's trial counsel was not constitutionally ineffective.

The petition does not list all of the reasons that petitioner raised in state court for his trial attorney's alleged ineffectiveness.  His brief on direct appeal included a laundry list of approximately seventeen alleged errors by defense counsel - including the alleged errors he includes in the petition. (SR 862-66, 880-92) (Dkt. No. 17-3). Ground Two of the habeas petition states that "counsel was ineffective for failing to make **routine** objections and not requesting certain instructions." (Am. Pet. Ground Two) (emphasis added).  The only "routine" objections listed in the petition are (1) counsel's failure to object to the prosecutor's statements to the jurors that they were going to get a look into "the drug world" and the "inherent danger that goes with that line of work;" (2) counsel's failure to object when the prosecutor asked the jurors to recall the terrorist attacks on 9/11; and (3) counsel's failure to object when the

prosecutor informed the jury that the People did not have to prove intent.  Petitioner raised counsel's failure to request a lesser included offense instruction of third degree assault, but this does not involve the failure to make a routine objection. (*Id.*)  In Ground Six of the petition, petitioner argues that counsel was ineffective when he failed to challenge the trial court's "subject matter jurisdiction" because the injured officer was a "federal officer acting in a federal capacity."[16]

Although this court will focus on the alleged errors that petitioner has raised in the petition, the court has examined all the alleged errors and has determined that none of them singly or in combination rise to the level of ineffective counsel.  Many of these "routine" objections are included in my discussion of cause relative to the failure to preserve a prosecutorial misconduct claim.  I have included some of the alleged errors that do not appear in the petition so that I may properly analyze cause and prejudice.

### 1.    Ineffective Counsel as "Cause"

#### a.    Failure to Move to Dismiss at the Close of Defense Proof

Before I address the above claims, I will address counsel's failure to move to dismiss after the close of petitioner's proof which resulted in the procedural default on his claim that the evidence was insufficient to convict him of the charges.  Even if the court assumed that the failure of counsel to renew his motion to dismiss at the end of the proof fell below an objective standard of reasonableness,[17] the petitioner suffered no prejudice as a result because the Appellate Division considered, and rejected, the merits

---

[16] Petitioner raised this claim in his pro se section 440.10 motion to vacate his conviction.

[17] This court makes no such finding.

of petitioner's claim in the alternative. Thus, there is no way that the result of the proceeding would have been different, and petitioner may not assert his counsel's alleged ineffectiveness as "cause" for his procedural default in failing to renew his sufficiency motion at the end of all the proof.

**b.    Failure to Object to Prosecutor's Conduct**

Petitioner was barred from raising his prosecutorial misconduct claims because his attorney did not object to the prosecutor's conduct, and thus, petitioner "failed to preserve" the claim. For the following reasons, counsel was not ineffective in failing to object to the prosecutor's alleged improper conduct. On direct appeal, petitioner raised a list of the prosecutor's alleged failings. As stated above, petitioner only raised four of those failings in his petition.[18] Petitioner claimed that counsel should have objected to the prosecutor's statements during voir dire of the jurors because he referred the jurors to "9/11," told the jurors during the opening statement, that they were going to get a look into the "drug world," and told the jurors that the prosecution did not have to prove "intent" in order to convict petitioner of second degree assault.

First, the prosecutor was correct in stating that the People were not required to prove "intent" to injure[19] in order to convict petitioner of second degree assault as discussed above. (T. 71). In any event, the prosecutor began his thought by telling the jurors that the judge would explain the law to them later, and finished his thought by

---

[18] Petitioner raised three instances in which he alleges counsel should have objected, and one instance in which counsel allegedly failed to request a jury instruction.

[19] During voir dire, the prosecutor stated that "I don't have to prove that he intended to cause the deputy that injury. Just that he intended to prevent the police from performing one of their duties and in the course of that he caused physical injury." (T. 71, SR 197).

asking the jurors to give their "assurance" that they would apply the law "as the judge explains it." (T. 71, SR 197). In context, the prosecutor's comment was not objectionable, and there would have been no reason for defense counsel to object at that time.

In fact, defense counsel mentioned the prosecutor's statement and emphasized that although, the People did not have to prove intent to "injure," "there is an intent involved in this case. And the prosecutors will have to prove that intent. Now that will be discussed with you by the judge at the end of the case." (T. 82, SR 208). Thus, both attorneys were able to discuss "intent" with the jurors. Petitioner's counsel may not have objected because he also wanted to discuss intent with the jurors. The court will not second guess strategic decisions made by counsel. *McKee v. United States*, 167 F.3d at 106.

Petitioner also argues that the prosecutor improperly discussed "9/11" with the jurors and improperly mentioned the funeral of a police officer during voir dire.[20] Once again, considering the prosecutor's statements in context, there was nothing objectionable in his conduct, and there was no reason for counsel to object. The prosecutor mentioned 9/11 in an attempt to make a point to the jurors. (T. 71-72, SR 197-98). The prosecutor was attempting to show that different people could see the same event, but describe the event differently. (*Id.*) The point was that just because two people described an event differently did not mean that one of them was not telling the truth. The prosecutor asked one of the jurors if she could remember from which

---

[20] Although the petition states that the prosecutor made this statement in his opening, it is clear from the transcript that the reference to 9/11 was made during voir dire of the jury.

direction the planes came when they hit the towers, and the juror stated that she did not remember. (T. 72, SR 198).  The prosecutor asked whether "the fact that somebody can't remember exactly specific minor details, does that mean that they didn't see what they are telling you that they saw?" (*Id.*)  The prosecutor then asked the prospective juror whether she could "keep an open mind and use your common sense about how people remember things and the shortcomings of peoples' memories." (T. 73, SR 199).

It is unclear why the petitioner would find this discussion objectionable because it would benefit the evaluation of all witness testimony, including his own.  Clearly, the prosecutor was simply attempting to make sure that the jurors understood that any witness's memory will not necessarily be perfect.  Defense counsel repeated the analogy for petitioner's benefit, during his opening statement when stating that, in some circumstances, the small details were important and could be considered in determining credibility issues. (T. 178-79, SR 356-57).  Thus, counsel did not act unreasonably in failing to "object" to the prosecutor's voir dire on this point.

Defense counsel also attempted to make sure during voir dire that the jurors would not be more sympathetic to the victim simply because he was a police officer. (T. 83, 144, SR 209-210, 288).  Apparently, there was a fatality in the Utica area involving a deputy sheriff, and defense counsel wished to make sure that, in case the jurors read about the incident in the media, they would not be more sympathetic to the officer in petitioner's case. (*Id.*)  Voir dire was the appropriate time to determine whether prospective jurors had or would have particular biases.  On direct appeal, petitioner's appellate counsel argued that "[a]lthough it was important to determine whether any

jurors would have any bias in a case that involved an injury to an officer, this could have been discovered through a more narrowly tailored inquiry." (SR 882). The fact that defense counsel could have done things differently does not rise to the level of "unreasonable conduct."

Petitioner also argues that his attorney was ineffective because he failed to object to the prosecutor's opening statement at various times. Petitioner argues that counsel should have objected when the prosecutor told the jury that they were going to "get a look into the drug world and the police officers that enforce our narcotics laws." (T. 166, SR 344). Although petitioner argues that this statement was objectionable, the prosecutor had the burden to show that the deputy marshal was injured in the course of performing his duties, and part of those duties was to arrest the passenger riding in petitioner's car, based upon his involvement with drugs. The jurors were going to hear about search warrants and people attempting to evade the police. The prosecutor's statements were fair comment on the evidence that he was going to present during the trial. Thus, no objection was necessary.[21]

Much of the testimony to which petitioner argues that counsel should have objected was simply not objectionable. With respect to the testimony/evidence to which counsel could have objected, his failure to object could have been strategic. Counsel could have considered that the damage to petitioner's case from an open discussion about the objection could have been greater than the damage to petitioner's

---

[21] The court notes that, consistent with what defense counsel told the jurors during voir dire, the prosecutor stated during his opening that petitioner did have to have "intent," and that "intent" was to "prevent the police from performing a lawful duty, and a police officer has to get hurt." (T. 167, 345).

case by simply ignoring the testimony and moving on with the case.[22] *See Bierenbaum v. Graham*, 607 F.3d 36, 57-58 (2d Cir. 2010) (failure to object reasonable when counsel was concerned that objection would "highlight" the argument that counsel found objectionable). Conceding facts that are damaging to a defendant does not, by itself, amount to ineffective assistance of counsel where there is a sound strategy behind the concession or when it was done to build trust with the jury in the face of overwhelming evidence supporting the concession. *Id.* at 52.

Petitioner argued in his state appellate brief that trial counsel failed to request an "adverse inference" charge with regard to the absence of a videotape from the police car, nor did he challenge the District Attorney's involvement in the "investigation." (SR 864). Defense counsel cross examined Officer Holt regarding whether the police car was equipped with a video camera. (T. 398, SR 580). Officer Holt testified that there was a camera, and he believed the camera was turned on at the time of the incident. However, when he went to look at the video tape "[i]t was a black screen." (T. 398-99, SR 580-81). Officer Holt could not recall whether he checked to make sure that the

---

[22] For example, petitioner argued on appeal that defense counsel should have objected during the direct examination of Investigator Fields when he testified that petitioner's "Pep Boys" receipt was found in the Acura that was being driven by the investigator on the day of the incident, and that the car had been seized by the police as the result of a narcotics investigation. (SR 865, *See* Fields: T. 211-12, SR 389-90). Petitioner told Investigator Fields at the station that he knew "they" were the police because he recognized the car as his. (Fields: T. 216, SR 394). Part of the prosecution's case was to show that the petitioner knew that the individuals who stopped him were police officers. Thus, this testimony and the receipt were relevant to an element of the People's case. The same is true for Investigator Field's testimony that he was familiar with petitioner and had seen him on multiple occasions. Even assuming that counsel could have objected, his objections were likely to be overruled, and then the Investigator's testimony would have been highlighted for the jury. In addition, cross-examined Investigator Fields on his statement, by getting him to admit that it was the first time he had testified about the ownership of the car. (Fields: T. 242, SR 420). Defense counsel also noted that the Pep Boys receipt predated the incident by four and one half years. (*Id.*)

camera was operational prior to the incident. (T. 399, SR 581).

The New York Court of Appeals has held that the entitlement to an adverse inference charge was established in 2013 by *People v. Handy*, 20 N.Y.3d 663 (2013), and prior to 2013, the availability of such a charge was discretionary. *People v. Blake*, 24 N.Y.3d 78, 82 (2014) (citing *Handy, supra*).  Petitioner's trial in this case was in 2010.  In any event, even assuming that petitioner would have been entitled to such a charge, it would not have made a difference in petitioner's case.

The reason for the absence of the police car video was clear to the jury.  Defense counsel challenged the admissibility of the re-enactment videotape, and the court heard argument on the issue. (T. 403-406, SR 619-22).  The court specifically found that the videotape was admissible, but that the defendant's objections went to the "weight" of the evidence, rather than its admissibility. (T. 405, 621).  The judge agreed to give a limiting instruction to the jury as to how they could consider the evidence. (*Id.*) Defense counsel asked Investigator Cady voir dire questions regarding the potential inaccuracy of the videotape.[23] (T. 430-35, SR 641-45).  After voir dire, defense counsel objected to the videotape, and the court admitted the evidence "over the objection of defense counsel." (T. 434-35, SR 645-46).  The judge then told the jury that they could either accept or reject the video tape, depending on whether it would "assist" them. (T. 435, SR 646).  Any further "objections" or requests by counsel were unnecessary.

---

[23] Defendant's theory regarding the video tape was that it was made without anyone sitting in the passenger side of the petitioner's SUV, and that as such, it was not an accurate re-enactment of the incident because petitioner claimed that Mr. Sanders blocked his view of the officers who were coming to the passenger side of the van, supporting the petitioner's argument that he was unaware that the individuals were police officers.

## 2.    Ineffective Counsel Generally

Petitioner also claims that his attorney was ineffective because he did not challenge "the trial court's subject matter jurisdiction as the person allegedly assaulted was a Federal Officer acting in a federal capacity and not state." (Am. Pet. Ground Six). Petitioner raised this claim in his section 440.10 motion. Petitioner's claim is meritless under any standard. Counsel did not "challenge" the court's jurisdiction on this basis because such a challenge would have been frivolous. Petitioner was charged with Assault, Second Degree in violation of New York Penal Law § 120.05(3). This section requires proof that the defendant "[w]ith intent to prevent a peace officer [or] a police officer . . . from performing a lawful duty, . . . cause[d] injury to such **peace officer** [or] **police officer**. *Id.* (emphasis added).

Petitioner argues that because Deputy Morawiec was a "federal" marshal, the court had no jurisdiction to prosecute an assault on a federal employee acting in a "federal capacity." (Am. Pet. at 11). First, the court would point out that Deputy Morawiec testified that, although he was a federal marshal, he was "assigned to the **Utica Police Department, Metro Narcotics Unit, and had been so assigned for the past year**. (Morawiec: T. 316, SR 498) (emphasis added). The investigation against Mr. Sanders was a state investigation, and the warrant was issued by a state court judge. In any event, regardless of Deputy Morawiec's employer, New York law provides that a list of federal officers that have the "powers" of state peace officers. N.Y. Crim. Proc. Law § 2.15. United States Marshals and Marshals Service Deputies are specifically mentioned in the statute. *Id.* § 2.15(4).

40

As respondent also points out, the section 440.10 court in this case held that the purpose of enacting the crime of assault, second degree was to protect law enforcement officers during the performance of their duties. (SR 1222-23) (citing *People v. Brenno*, 16 Misc. 2d 213 (Ct. Ct. 2007). In *Brenno*, the court held that even though federal officers are not listed in the state law definition of peace officers or police officers, and that section 2.15 only gives federal officers certain powers that state officers have, they are still included in the group of police or peace officers who are treated by statute as potential victims of "menacing against a police officer."[24] 16 Misc. 3d at 215. The court specifically stated that "[t]he fact that Border Patrol Agents do not fall within the statutory definition of 'police officer' or 'peace officer' is of no moment. As 'law enforcement officers' they are within the group which the charged statute was intended to protect." *Id.* at 215-16. Even though the statute in *Brenno* involved menacing, the analysis applied equally to Assault, Second Degree in this case. The section 440.10 court did not act contrary to well-established Supreme Court precedent in finding that petitioner's counsel was not ineffective in failing to challenge the court's "jurisdiction."[25]

Petitioner also claimed that his attorney was ineffective for failing to request a lesser included offense charge of Assault, Third Degree. Petitioner's theory for

---

[24] N.Y. Penal Law § 120.18.

[25] The court notes that, during deliberations, the jury asked the judge to "define more about peace officer or clarify it more." (T. 570-71, SR 781-82). The judge actually cited section 2.15 of the Criminal Procedure Law, wherein it says that "Federal law enforcement officers shall have the powers of peace officers. And under subdivision four, it says: United States Marshals and Marshal Service Deputies. So you can consider Officer Morawiec as a peace officer." (T. 571, SR 782).

requesting this jury charge was that petitioner could have "recklessly" caused physician injury to "another person," assuming that the jury believed that he did not know that the victim was a police or peace officer. (SR 884-85) (Petitioner's App. Br.)  It was simply petitioner's "reckless" attempt to get away from individuals who he thought were "potential criminals." (SR 885).

Under New York Law, a lesser included offense instruction must be given to the jury where (1) it is theoretically impossible to commit the greater crime without committing the lesser crime, and (2) a reasonable view of the evidence would permit the jury to find that the defendant committed the lesser, but not the greater crime. *Serrata v. Fischer*, No. 13 Civ. 2632, 2013 WL 5708599, at *7 (S.D.N.Y. Oct. 21, 2013) (citing *People v. Glover*, 57 N.Y.2d 61, 63-64 (1982) (citing N.Y. Crim. Proc. Law § 1.20 (37)).

Petitioner in this case cannot fulfill the first requirement listed above.  A defendant is guilty of Assault, Third Degree when (1) he causes injury to another person or to a third person, with intent to cause physical injury to another person; (2) he recklessly causes physical injury to another person; or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon or a dangerous instrument. N.Y. Penal Law § 120.00(1)-(3).

Petitioner was charged with Assault, Second Degree.  The relevant portion of the statute with which petitioner was charged provides that the defendant have the intent to prevent a peace officer, a police officer, or a variety of other law enforcement or health

42

care personnel,[26] who are in the course of performing a lawful duty, from performing their lawful duty, and he or she causes physical injury to such peace officer, police officer or other listed personnel. N.Y. Penal Law § 120.05(3).  In *People ex rel. Gray v. Tekben*, 57 N.Y.2d 651, 653 (1982), the New York Court of Appeals held that "[t]he crime of assault in the third degree under subdivision 1 of section 120.00 of the Penal Law is not a lesser included offense of assault in the second degree under subdivision 3 of section 120.05 of the Penal Law inasmuch as it is possible to commit the latter without possessing the intent to injure which is the gravamen of the former . . . ."

Petitioner was not charged with intentionally, recklessly, or negligently injuring the deputy marshal, and the relevant section of the second degree assault statute only requires intent to prevent the officer from performing his duty, not intent to injure.  The crime is "'one of strict liability as far as the injury is concerned.  Even if the [defendant] caused the injury to the officer accidentally, he was guilty of assault in the second degree if the accident happened while he intentionally acted to prevent the performance of the officer's duty.'" *People v. Pierce*, 201 A.D.2d 677 (2d Dep't 1994) (alterations in original) (quoting *People ex rel. Gray v. Tekben*, 86 A.D.2d 176, 178 (2d Dep't), *aff'd*, 57 N.Y.2d 651 (1982) (other citations omitted) (overruling on other grounds recognized by *People v. Udzinski*, 146 A.D.2d 245, 255 (2d Dep't 1989)).  Petitioner in this case could commit second degree assault under section three without committing third degree assault under any of the sections.  Thus, the state court did not act contrary to *Strickland* when it found that the conduct of petitioner's attorney in failing to request

---

[26] This court has only listed the relevant personnel in this recommendation.  The list is extremely long and not relevant to this case.

such an instruction did not fall below an objective standard of reasonableness.  A request to charge third degree assault would have been denied.

## VI.    __Ineffective Assistance of Appellate Counsel__

### A.    **Legal Standards**

The general standard for ineffective assistance of counsel, articulated by the Supreme Court in *Strickland v. Washington*, applies to both trial and appellate counsel. *McKee v. United States*, 167 F.3d 103, 106 (2d Cir.1999) (*Strickland* standard also applies to effectiveness of appellate counsel).  While a defendant has the right to effective counsel on appeal, *Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985), in the appellate context, counsel is not required to advance every non-frivolous argument that could be made. *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts*, 469 U.S. at 394. *See also Jones v. Barnes*, 463 U.S. 745, 75 (1983)).  "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (citing *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).

### B.    **Application**

Because this claim is unexhausted, and the state court did not consider the merits, the AEDPA standard does not apply.  Rather, as stated above, the standard for considering an unexhausted claim under section 2254(b)(2) is whether it is "plainly meritless." *Rhines, supra.*

Petitioner claims that appellate counsel should have argued that trial counsel was

ineffective in failing to raise an "entrapment defense." Such a claim would have been meritless at best, and borders on frivolous. Entrapment under New York law is an affirmative defense, which the defendant must prove by a preponderance of the evidence. *Day v. Ercole*, No. 09 Civ. 10279, 2010 WL 5094320, at \*5 (S.D.N.Y. Nov. 17, 2010) (citing inter alia N.Y. Penal Law § 25.00(2)). In order to assert entrapment, a defendant must show both that the crime was "induced or encouraged" by official activity and that the defendant had no predisposition to engage in such conduct. *Vega v. Walsh*, 258 F. App'x 356, 358 (2d Cir. 2007) (citations omitted).

Under the facts stated above, it is unclear how defense counsel could have presented a defense in which the defendant admitted hitting an officer who was attempting to carry out a lawful duty, but the officers induced petitioner to do it, and defendant had no predisposition to commit the offense. Petitioner's claim that the officers induced petitioner to back up and hit one of them is beyond meritless. No view of the testimony could support such a defense, and appellate counsel was not ineffective in failing to argue that trial counsel was ineffective in failing to raise it.

The attempt to assert that counsel was ineffective in failing to raise "contributory negligence" would also have been a frivolous claim by appellate counsel. "Contributory negligence"[27] is a defense to a civil tort claim in which the fault is apportioned between the parties if appropriate. In any event, as stated above, the statute under which petitioner was convicted does not require that petitioner intended to injure

---

[27] The court notes that the concept of contributory negligence was succeeded by the term "comparative negligence." *See Barker v. Kallash*, 63 N.Y.2d 19, 24 (1984) (contributory negligence cases resolved under the rule of comparative negligence).

the officer, negligently or otherwise, and it is inconceivable that one would claim that Deputy Morawiec was somehow "negligent" in being hit by the petitioner who was attempting to escape a police stop.  The section of second degree assault under which petitioner was convicted was a "strict liability" insofar as the injury is concerned. *People v. Pierce*, *supra*. Thus, appellate counsel was not ineffective in failing to raise these two meritless arguments on appeal, and petitioner's Ground Seven may be dismissed.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that the petition be **DENIED and DISMISSED**, and it is

RECOMMENDED, that a certificate of appealability be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: April 6, 2017

Hon. Andrew T. Baxter
U.S. Magistrate Judge